**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| CACI, INC.-FEDERAL, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) Civil Action No.: _____ |
| v. | ) |
| | ) |
| T2S, LLC, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

**<u>VERIFIED COMPLAINT</u>**

Plaintiff, CACI, INC.-FEDERAL ("CACI" or "Plaintiff"), by counsel, brings this action against Defendant, T2S, LLC ("T2S" or "Defendant') and states and alleges as follows:

**NATURE OF THE CASE**

1.       CACI brings this action due to T2S's breach of its Non-Solicitation agreement with CACI and recent unlawful poaching of at least twenty (20) highly skilled CACI employees on an Army program, T2S's breach of its obligation to negotiate in good faith with CACI in connection with the successor work on such Army program, and T2S's fraudulent inducement of CACI.  For the last six years, T2S was a subcontractor to CACI (the prime contractor) on the Army program referred to herein as MEGATRON.  When the parties' positions flipped for the successor solicitation of this Army work known as CYBERTRON, CACI, at T2S's inducement, teamed together to work on and submit a proposal to the Government with T2S as the proposed prime and CACI as the proposed subcontractor.  Yet, after the award of the CYBERTRON program to T2S and notwithstanding a contractually agreed 60-day period of required "good faith negotiation," T2S abruptly and arbitrarily imposed a deadline that truncated the required negotiating period, all while

1

directly targeting and hiring over twenty (20) of CACI's incumbent personnel for T2S's own use on this Army project that CACI had substantially helped T2S win.  CACI brings this action to redress these wrongs committed by T2S and from which T2S should not unlawfully profit.

2.     CACI asserts claims against T2S of breach of the parties' Subcontract (Count I, see Exhibit 1), breach of the good faith negotiation provisions of the parties' Teaming Agreement (Count II, see Exhibit 2), fraud in the inducement in obtaining CACI's teaming agreement support to prepare T2S's winning CYBERTRON proposal (Count III), and unjust enrichment (Count IV).

3.     CACI seeks monetary damages based on T2S's breaches of its Non-Solicitation agreement with CACI in connection with T2S's recent poaching of CACI's personnel to work on this continuing Army project, as well as damages from its failure to engage in any good faith negotiations as required, and its fraudulent inducement of CACI to enter into such agreement with T2S for the CYBERTRON program work.

### THE PARTIES

4.     Plaintiff CACI is a Delaware corporation with its headquarters at 12021 Sunset Hills Road, Reston, Virginia, 20190.  CACI is a multi-billion dollar provider of solutions and services for intelligence, defense, and federal civilian customers in support of Government transformation and national security missions.  CACI operates through offices and subsidiaries in North America and around the globe.

5.     Defendant T2S is a Maryland limited liability company with its headquarters at 4696 Millennium Drive, Suite 300, Belcamp, MD 21017.  Upon information and belief, T2S is not a citizen of Virginia or Delaware.  T2S is a United States Government contractor.

### JURISDICTION AND VENUE

6.     This Court has jurisdiction over this matter in accordance with 28 U.S.C. §

1332(a)(1), as CACI is a citizen of a different state than T2S and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.      This Court has personal jurisdiction over T2S because it conducts business within the Eastern District of Virginia through, among other things, prime and subcontract arrangements with Virginia corporations such as CACI.

8.      Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b)(2) and Local Civil Rule 3(C) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this division, and T2S maintains contacts with this judicial district and division as it consistently conducts business with Virginia-based companies that conduct business within the Eastern District of Virginia.

9.      Moreover, the parties' MEGATRON Subcontract, governed by Virginia law, provides that any dispute "under this Agreement shall be litigated in the Federal courts of the United States or the courts of the Commonwealth of Virginia and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding." (Exhibit 1 at 22.)

### GENERAL ALLEGATIONS

10.     CACI is a Government contractor headquartered in Reston, Virginia.

11.     CACI provides a variety of information solutions and professional services in support of national security missions and government transformation for Intelligence, Defense, and Federal Civilian customers, as well as State Government agencies. CACI is an $8.6 billion company which has approximately 25,000 employees worldwide.

12.     CACI delivers differentiated expertise and technology to United States Government customers in support of critical national security missions and Government modernization. Like other Government contractors, CACI regularly enters into subcontracts with other Government

contractors, both in the capacity of a prime contractor to Government customers and as a subcontractor to prime contractors serving Government customers.

**The MEGATRON Subcontract and**
**T2S's Agreed Non-Solicitation of CACI Employees**

13.     CACI entered into a subcontract agreement ("MEGATRON Subcontract") with T2S on April 21, 2020 under which T2S provided services to CACI in support of CACI's performance of Government Contract No. 47QTCK18D0009, Task Order No. 47QFWA20F0011 ("the MEGATRON Prime Task Order") issued by the United States General Services Administration ("GSA") to provide support to the United States Army's MEGATRON program. A true and correct copy of the MEGATRON Subcontract is attached hereto as Exhibit 1.

14.     Under the MEGATRON Prime Task Order, CACI provided information technology support and services to the United States Army.

15.     CACI's MEGATRON Prime Task Order and its MEGATRON Subcontract with T2S, as subsequently modified by the parties through Modifications Nos. 70 and 71 in April 2025, both expired on April 6, 2026.

16.     CACI's specially trained and experienced personnel provided on the MEGATRON Prime Task Order were invaluable to the Army customer. Some of CACI's employees who provided services on the MEGATRON project have been with CACI since the outset of the MEGATRON Prime Task Order and have worked for the Army customer for several years. Over the course of CACI's performance on the MEGATRON Prime Task Order, the Army customer has complimented and praised CACI's employees staffed on this project.

17.     As part of CACI's support for its Army government customer and its services on the MEGATRON Prime Task Order, CACI expended significant effort and expense in identifying, sourcing, recruiting, and hiring and training multiple employees for the positions of, for example,

4

Cyber Security T3 and Systems Engineering T4.  All CACI personnel who supported the MEGATRON Prime Task Order had Secret security clearance at minimum, and many had a TS/SCI clearance.

18.    The MEGATRON Subcontract included the following non-solicitation clause prohibiting T2S from soliciting CACI employees supporting the MEGATRON Prime Task Order during the period of the subcontract and for one (1) year following its expiration—*i.e.*, through April 5, 2027:

### NON-SOLICITATION OF PERSONNEL

Seller [T2S] shall not directly or indirectly solicit, endeavor to hire, hire, consult, or otherwise contract with any employee(s) of the Buyer [CACI] who are associated with the efforts and performance of this Agreement hereunder (and any extensions or modifications) for the duration of the Agreement AND for a period of one (1) year after the conclusion thereof.  In the event this Article is breached, Buyer shall have the right to seek an injunction or any other remedy available by law. Any legal expenses involved with the enforcement of this provision shall be paid by the Seller to the Buyer.  Direct solicitation does not include advertisements published in the general media, except to the extent that an individual was specifically encouraged to respond to such advertisements.  Nothing in this Article restricts an individual employee's right to seek employment with Seller to perform work unrelated to this Agreement hereunder (and any extensions or modifications thereto).

(Exhibit 1, at 24.)

**The Parties' CYBERTRON Teaming Agreement, and T2S's Unlawful Solicitation of CACI Employees and Failure to Negotiate in Good Faith**

19.    On or about September 9, 2025, GSA issued Solicitation RFP1781164 under its GSA OASIS+ Unrestricted vehicle to seek proposals for the United States Army's CYBERTRON program, the successor to the MEGATRON program.

20.    In response to the CYBERTRON program opportunity, CACI and T2S entered into a teaming agreement ("the CYBERTRON Teaming Agreement") on September 22, 2025.  A true

and correct copy of the CYBERTRON Teaming Agreement, governed by Maryland law, is attached hereto as Exhibit 2.

21.     T2S was the proposed prime contractor, and CACI was the proposed subcontractor under the CYBERTRON Teaming Agreement.

22.     Under the CYBERTRON Teaming Agreement, CACI expended significant effort, costs, and resources in assisting T2S with preparation of its CYBERTRON proposal to GSA.

23.     On February 27, 2026, GSA awarded T2S a task order under T2S's OASIS+ contract vehicle for the CYBERTRON (Unrestricted) program ("the CYBERTRON Prime Task Order").

24.     The MEGATRON program ended on April 6, 2026, and its successor CYBERTRON program began on or about April 7, 2026.

25.     As noted previously, the MEGATRON Subcontract prohibited T2S from soliciting CACI personnel who supported the MEGATRON Prime Task Order for *one year* following the end of the MEGATRON Subcontract.  Nevertheless, as set forth below, CACI learned *one day* after the end of the MEGATRON Subcontract that T2S had begun unlawfully soliciting these CACI incumbent employees.

26.     As part of T2S's inducement of CACI to enter into the CYBERTRON Teaming Agreement, T2S represented to CACI that it would negotiate in good faith with its long-time partner a subcontract on this continuing Army work.

27.     As set forth in the CYBERTRON Teaming Agreement, "[i]n the event T2S is awarded the Prime Contract and the Prime Contract includes the Work [as defined in Exhibit A to the CYBERTRON Teaming Agreement], the Parties agree to enter into good faith negotiations of a subcontract for the Work."  (Exhibit 2, § 8.1.)

28.     Exhibit A of the Subcontractor Statement of Work of the CYBERTRON Teaming

Agreement guaranteed CACI workshare in any CYBERTRON subcontract equal to the current number of full-time employees CACI had under the MEGATRON Prime Task Order directly supporting the Army's Cryptographic Modernization Branch, less ten (10) such employees:

> T2S acknowledges Subcontractor's [CACI's] significant incumbent presence and commits to providing Subcontractor with a guaranteed workshare equal to the number of its current incumbent employees on the Megatron II contract (excluding subcontractor or other non-employees) who directly support the Government's Cryptographic Modernization Branch and transitioning incumbency personnel, less 10 FTEs (e.g., 50 current FTEs – 10 FTEs = 40 FTEs).

(Exhibit 2, at 7–8.)

29.     The statements T2S made to CACI were material and induced CACI to join T2S's CYBERTRON team, execute the CYBERTRON Teaming Agreement (which T2S had drafted), and assist T2S in preparing a winning CYBERTRON proposal to GSA.

30.     The CYBERTRON Teaming Agreement required CACI to support the preparation of the T2S team's CYBERTRON proposal.  (See Exhibit 2, § 1.1.)

31.     Indeed, CACI played a leading role in preparing the T2S team's CYBERTRON proposal, including: providing three (3) key personnel resumes to meet GSA's proposal requirements; providing subject matter experts to assist in preparing for oral briefings preparations and caucusing; providing scenario development; providing pricing strategy support and management and transition support for T2S's written slide submission to GSA; and leading a significant portion of the oral presentation to GSA.

32.     CACI incurred substantial costs and invested substantial resources in assisting T2S in preparing the CYBERTRON proposal.

33.     As part of the CYBERTRON proposal preparation activity, CACI provided T2S a labor rate card in October 2025.  The labor rate card listed the hourly rates CACI proposed to apply to each labor category it would fill under the CYBERTRON subcontract in accordance with the

CYBERTRON Teaming Agreement if T2S won the CYBERTRON award.

34.    Due to funding lapses, the Federal Government shut down between October 1 and November 12, 2025.

35.    Notwithstanding the Federal Government shutdown, T2S submitted its CYBERTRON proposal to the GSA on October 10, 2025.

36.    After the Government shutdown ended, GSA asked CYBERTRON offerors to reconfirm the labor rates they had provided in the proposals.  In support of this request, on December 1, 2025, T2S asked CACI to confirm the labor rates CACI had provided in the labor rate card it had originally provided T2S in October 2025 remained valid for resubmission to the Government. CACI confirmed its labor rates remained valid on December 3, 2025.

37.    GSA awarded the CYBERTRON Prime Task Order to T2S on February 27, 2026.

38.    Section 9.1(d) of the CYBERTRON Teaming Agreement provided that the CYBERTRON Teaming Agreement would terminate upon the "[f]ailure of the Parties, despite their good faith efforts, to reach an agreement on the terms and conditions of a subcontract within sixty (60) calendar days from the commencement of active negotiations".  (Exhibit 2, § 9.1(d).)

39.    T2S commenced active negotiations of a CYBERTRON subcontract with CACI on March 24, 2026, twenty-five (25) days after T2S received the CYBERTRON Prime Task Order award from GSA, when T2S Contracts Administrator Angela Buono sent to CACI a Request for Proposal (the "T2S RFP") and a draft CYBERTRON subcontract for CACI's review.

40.    CACI submitted its response to the T2S RFP on March 31, 2026, including proposed changes to T2S's draft CYBERTRON subcontract.

41.    On April 3, 2026, CACI provided a roster to T2S listing the names of each individual employee CACI intended to support the CYBERTRON subcontract and the applicable labor

categories and labor rates to each individual.  T2S was familiar with the individuals on the roster CACI provided, as T2S had worked with these CACI employees under the MEGATRON Subcontract.

42.    At some date prior to April 7, 2026, the date on which T2S was to take on the prior MEGATRON program work under the CYBERTRON Prime Task Order, the CYBERTRON Prime Task Order went into force and effect.

43.    On April 4, 2026—two (2) days before the end of the MEGATRON Prime Task Order and three (3) days before CACI's work under the CYBERTRON Prime Task Order was to begin—T2S informed CACI that it wanted to realign CACI's incumbent personnel to lower-level categories and rates in an effort to lower the overall cost of the CYBERTRON subcontract T2S was negotiating with CACI under the CYBERTRON Teaming Agreement.  Although CACI had provided its labor rates in October 2025 and reconfirmed them with T2S in December 2025, T2S raised no objections to CACI's labor rates until three (3) days before CACI's CYBERTRON work was to begin.

44.    T2S's proposed realignment would have placed CACI personnel in labor categories that did not match their skills and experience, creating a significant compliance, performance and audit risk, which CACI advised T2S of during the parties' negotiations and in writing on April 8 following CACI's good faith, line-by-line review of T2S's proposed realignment.

45.    On April 6, the last day of the MEGATRON Prime Task Order and one (1) day before CACI's work under the CYBERTRON Prime Task Order was to begin, T2S issued CACI an "authorization to proceed" with work in support of the CYBERTRON Prime Task Order notwithstanding the fact that T2S and CACI had not yet executed a subcontract for the CYBERTRON work.  The authorization to proceed from T2S notably covered only three (3) "key

9

personnel" positions CACI would provide under the CYBERTRON subcontract. It did not cover the remaining positions that the CYBERTRON Teaming Agreement called for CACI to provide.

46.    The authorization to proceed from T2S also included the following term setting a deadline to complete negotiations of the CYBERTRON subcontract:

> The Parties agree to negotiate in good faith labor rates for any remaining positions not expressly priced in this Authorization to Proceed. If the Parties are unable to reach agreement on such rates by 5:00pm EST on Friday, April 10, 2026, either Party may, upon written notice, discontinue negotiations with respect to such positions, and neither Party shall have any further obligation to the other with respect to these positions.

47.    CACI did not accept T2S's authorization to proceed because the April 10, 2026 deadline had no basis in the CYBERTRON Teaming Agreement, which provided a sixty (60) day window to negotiate the CYBERTRON subcontract beginning upon the "commencement of active negotiations."  As active negotiations of a CYBERTRON subcontract with CACI began on March 24, 2026, this 60-day window would not close until May 23, 2026.

48.    The CYBERTRON Teaming Agreement did not permit T2S to unilaterally terminate negotiation of positions on April 10, as T2S's authorization to proceed purported to do.  Moreover, T2S provided its proposed deadline of April 10 on April 6, unreasonably shortening the remaining window to negotiate the CYBERTRON subcontract to four (4) days—a further indication that T2S was not negotiating in good faith as the CYBERTRON Teaming Agreement required.

49.    On April 7, 2026, notwithstanding the fact that CACI and T2S were within the CYBERTRON Teaming Agreement's window for good faith negotiating of a CYBERTRON subcontract, and notwithstanding the MEGATRON Subcontract's prohibition on the solicitation of CACI personnel that supported CACI's MEGATRON Prime Task Order, CACI learned that T2S had begun targeting and soliciting the CACI personnel listed in the personnel roster CACI provided to T2S on April 3 through a third-party recruiting service called National Staffing Associates LLC.

10

Each of the CACI employees that T2S solicited had supported CACI's MEGATRON Prime Task Order and were subject to the MEGATRON Subcontract's non-solicitation clause.

50.     On April 9, 2026, CACI sent a letter to the CEO and General Counsel of T2S demanding that T2S cease and desist from soliciting CACI personnel.  CACI received confirmation of the letter's delivery from the courier (UPS) on April 10.  T2S failed to respond to this cease and desist correspondence.

51.     On April 10, 2026, one CACI incumbent employee informed CACI upon departing for T2S that he "was sorry things haven't worked out contract-wise" with CACI.  Yet, as of April 10, CACI believed it was in the early stages of negotiating a subcontract with T2S.  Upon information and belief, T2S, either directly or indirectly through its recruiter, was advising CACI incumbent employees that there was not going to be a position for them at CACI even though the CACI subcontract negotiation with T2S had only recently begun.

52.     As of April 12, 2026, numerous CACI incumbent employees that CACI employed on the MEGATRON Prime Task Order and intended to support the CYBERTRON subcontract had resigned from CACI, and CACI knows or has reason to believe have joined T2S.  Another additional CACI incumbent employee had an open offer of employment from T2S and has since joined T2S.

53.     CACI was prepared if necessary to place these now departed MEGATRON incumbent employees on other applicable government contracts and IT-related roles within CACI.

54.     On April 13, 2026, notably after T2S's *en masse* poaching of CACI employees had begun and thirteen (13) days after CACI submitted to T2S its response to the T2S RFP and proposed revisions to T2S's draft CYBERTRON subcontract, T2S responded to CACI's response to the T2S RFP.  T2S's response included responses to CACI's proposed changes to the draft CYBERTRON subcontract that were not in good faith and unduly restrictive to CACI.  For example, T2S's draft

11

subcontract permitted T2S to terminate the subcontract for convenience and replace CACI personnel for any reason, even if the CYBERTRON Prime Task Order remained in force and effect and the Government continued to require the work CACI was performing under the subcontract.

55.     Despite the terms of the MEGATRON Subcontract and the CYBERTRON Teaming Agreement and CACI's substantial assistance in preparing T2S's CYBERTRON winning proposal, T2S improperly solicited CACI personnel to support the CYBERTRON Prime Task Order and refused to negotiate in good faith with CACI in accordance with the terms of the CYBERTRON Teaming Agreement.

56.     T2S's conduct has breached the non-solicitation restriction in the MEGATRON Subcontract and the good faith negotiation obligation in the CYBERTRON Teaming Agreement and fraudulently induced CACI, which has caused and will continue to cause CACI to suffer substantial damages, and unjustly enrich T2S.

**COUNT I –**
**BREACH OF CONTRACT (MEGATRON SUBCONTRACT)**

57.     CACI restates and incorporates by reference the allegations set forth in paragraphs 1–56 as if fully set forth herein.

58.     T2S entered into a valid and enforceable MEGATRON Subcontract with CACI.

59.     The MEGATRON Subcontract, *inter alia*, prohibited T2S from, directly or indirectly, soliciting or endeavoring to hire CACI employees associated with the MEGATRON Prime Task Order for the duration of the parties' MEGATRON Subcontract and for a one (1) year period after its conclusion.  (See Exhibit 1, at 24.)

60.     T2S materially breached the MEGATRON Subcontract by, directly or indirectly, soliciting and hiring at least twenty (20) CACI employees who had supported the MEGATRON Prime Task Order in violation of the MEGATRON Subcontract's non-solicitation clause.

12

61. T2S's material breaches of the MEGATRON Subcontract have caused CACI to suffer significant damages.

62. CACI is entitled to recover its attorneys' fees and costs incurred in connection with this action from T2S.  (See Exhibit 1, at 24.)

## COUNT II –
### BREACH OF CONTRACT (CYBERTRON TEAMING AGREEMENT)

63. CACI restates and incorporates by reference the allegations set forth in paragraphs 1–62 as if fully set forth herein.

64. The CYBERTRON Teaming Agreement that T2S entered into with CACI included a valid and enforceable obligation requiring T2S to negotiate in good faith with CACI on a CYBERTRON subcontract.  (See Exhibit 2, § 8.)

65. T2S materially breached the CYBERTRON Teaming Agreement by failing to negotiate with CACI in good faith on a CYBERTRON subcontract.

66. Rather than comply with its good faith negotiation obligation, T2S, *inter alia*,  (1) unreasonably delayed the commencement of active negotiations of the CYBERTRON subcontract for over one month after receiving the CYBERTRON Prime Contract and unreasonably delayed its responses to CACI during the negotiation; (2) proposed an eleventh-hour realignment of CACI's incumbent personnel to lower-level labor categories and rates after failing to raise any concerns about CACI's labor rate and labor categories in the months prior; (3) ignored the audit risk associated with such proposed lower-level labor category realignment of CACI's incumbent personnel; (4) immediately poached CACI incumbent employees upon the expiration of the MEGATRON Subcontract and at the same time CACI and T2S were negotiating a CYBERTRON subcontract; (5) recruited such CACI employees by relying, at least in part, on a CACI personnel roster CACI had provided T2S as part of the parties' negotiations; and (6) imposed arbitrary and

unreasonably short deadlines on the CYBERTRON subcontract negotiation that had no basis in the CYBERTRON Teaming Agreement.

67.     T2S's material breaches of the good faith negotiation requirement of the CYBERTRON Teaming Agreement have caused CACI to suffer significant damages.

## COUNT III –
## FRAUD IN THE INDUCEMENT

68.     CACI restates and incorporates by reference the allegations set forth in paragraphs 1–67 as if fully set forth herein.

69.     T2S fraudulently induced CACI to enter into the CYBERTRON Teaming Agreement and assist T2S in preparing its CYBERTRON proposal to the Government by knowingly and falsely representing to CACI that T2S would negotiate in good faith with CACI on a CYBERTRON subcontract upon award.

70.     At the time T2S made this material representation and promise to CACI to negotiate in good faith, it did not have the intention of fulfilling it.

71.     T2S intended at the time it made these material misrepresentations that CACI would act on T2S's misrepresentations to join T2S's CYBERTRON team, enter into the CYBERTRON Teaming Agreement and substantially assist T2S in preparing a successful CYBERTRON proposal.

72.     CACI detrimentally and justifiably relied on T2S's material misrepresentations, and it would not have entered into the CYBERTRON Teaming Agreement nor invested substantial time and resources in assisting T2S to prepare a winning CYBERTRON proposal, had it known that T2S would never negotiate in good faith with CACI by acting as aforesaid.

73.     T2S's fraudulent acts have been willful, wanton and in malicious disregard of CACI's rights.

74.     As a direct and proximate result of T2S's fraud, CACI has suffered significant

damages.

## COUNT IV (in the alternative to COUNT II) –
## UNJUST ENRICHMENT

75.     CACI restates and incorporates by reference the allegations set forth in paragraphs 1–74 as if fully set forth herein.

76.     T2S was unjustly enriched by CACI's support in preparing the CYBERTRON proposal to the Government.  Indeed, CACI performed the majority of the work to prepare the CYBERTRON proposal.

77.     Without CACI's assistance and input, including but not limited to assistance from the CACI employees who previously worked on the MEGATRON Prime Task Order and were slated to support the CYBERTRON program under the planned T2S subcontract to CACI, T2S would not have been able to prepare a successful proposal for the CYBERTRON award.

78.     CACI thus conferred to T2S the benefit of CACI's time, resources, and unique expertise in preparing the CYBERTRON proposal.

79.     T2S knew that CACI had conferred this benefit, and T2S accepted this benefit under circumstances that render it inequitable for T2S to retain the benefit.

## PRAYER FOR RELIEF

WHEREFORE, CACI respectfully requests that the Court enter judgment in its favor:

A.     Awarding CACI monetary damages, including but not limited to lost profits plus attorneys' fees and costs, on Count I in an amount to be determined at trial for T2S's breaches of the Non-Solicitation of Personnel clause of the MEGATRON Subcontract;

B.     Awarding CACI monetary damages on Count II in an amount to be determined at trial for T2S's breaches of its good faith negotiation obligations under the CYBERTRON Teaming Agreement;

15

C.      Awarding CACI monetary damages, including but not limited to lost profits plus attorneys' fees and costs pursuant to *Prospect Dev. Co. v. Bershader*, 258 Va. 75 (1999), on Count III in an amount to be determined at trial for T2S's fraudulent actions;

D.      Awarding CACI punitive damages in the amount of $350,000 on Count III for T2S's willful, wanton and malicious conduct in violation of law;

E.      Awarding CACI monetary damages on Count IV in an amount to be determined at trial based on the costs CACI incurred in assisting T2S in preparing its CYBERTRON proposal, based upon which the Government awarded the CYBERTRON Prime Task Order to T2S; and

F.      Such other relief as the Court deems just and proper.

16

## VERIFICATION

I verify, on behalf of Plaintiff CACI, INC.-FEDERAL, that the foregoing allegations are true and correct.

Executed on May 14, 2026

_____
Alanna Vint
Program Manager, C3I Solutions
CACI, INC.-FEDERAL

17

Dated May 14, 2026

Respectfully submitted,

*/s/ Brandon H. Elledge*
Brandon H. Elledge (VSB No. 45349)
Robert J. Farlow (VSB No. 87507)
Christian B. Hecht (VSB No. 98220)
**HOLLAND & KNIGHT LLP**
1650 Tysons Boulevard, Suite 1700
Tysons, Virginia 22102
703.720.8015 telephone
703.720.8610 facsimile
brandon.elledge@hklaw.com
robert.farlow@hklaw.com
christian.hecht@hklaw.com


*Counsel for Plaintiff CACI, INC.-FEDERAL*